UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 05 B 52582 |
| JEFFREY OSCARSON, | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| GREEN BAY PACKAGING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 06 A 511 |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY OSCARSON, | ) | Judge Pamela S. Hollis |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter comes before the court on remand from the U.S. District Court. In the underlying complaint, Green Bay Packaging, Inc., sought a finding that Jeffrey Oscarson's debt to it was nondischargeable under 11 U.S.C. § 523(a)(2)(B), and that his discharge should be denied under 11 U.S.C. § 727(a)(4)(A). Following a trial this court entered a memorandum opinion and order granting judgment for Jeffrey Oscarson ("Jeff") on all counts. The District Court affirmed the nondischargeability finding, but reversed the decision under § 727(a)(4)(A). The District Court then remanded the proceeding, directing this court to determine whether Jeff met his burden of proving that he lacked fraudulent intent when he completed his bankruptcy petition and schedules. For the reasons stated below, the court finds that Jeff did not meet his burden of proving that he lacked fraudulent intent. Green Bay prevails on its request to deny Jeff's discharge under § 727(a)(4)(A), and judgment will be entered against Jeff on this count.

## BACKGROUND

The District Court did not reverse any of this court's findings of fact. Instead, certain of this court's factual findings were adopted by the District Court in its opinion. This court will not restate the findings made in its original opinion, except to the extent necessary to provide a brief summary of the facts and to resolve the one outstanding issue of law. References to exhibits can be found in the original opinion.

Approximately 40 years ago, Fred Oscarson formed Midwest Packaging for the purpose of acting as the middleman in transactions involving corrugated boxing and packing materials. Fred's son Jeff joined Midwest in 1995 as a salesman. Midwest was organized as a limited liability company, and by 2003, Jeff had purchased Fred's shares in the company. Green Bay was Midwest's primary supplier for many years.

Jeff's Failure to Disclose Certain Financial Accounts

Jeff filed for relief under Chapter 7 of the Bankruptcy Code on October 13, 2005, and filed his bankruptcy schedules and Statement of Financial Affairs that same day. He subsequently filed four amendments to the schedules. In response to Question 2 on Schedule B, which asks debtors to list checking, savings or other financial accounts, Jeff listed only a checking account at Fifth Third Bank. None of the amendments changed this response.

Green Bay introduced a group exhibit with multiple statements from Edward Jones, reflecting a joint account for Jeff and his wife Laura Oscarson, #233-08383-1-7. Two types of assets are shown on those statements, a cash and money market account held at Edward Jones, and a mutual fund account held outside Edward Jones. Jeff testified that he did not disclose account #233-08383-1-7 on his bankruptcy schedules. As

of the date of Jeff's bankruptcy filing, the cash and money market account held approximately $16.31 and the mutual fund account contained approximately $2,600.00. Jeff testified that he disclosed the existence of this account to his Chapter 7 trustee, Charles Myler, and offered the trustee a one-half interest in the account, including accrued postpetition interest.

Transfers to Laura Oscarson

On or about June 4, 2005, Laura wrote a check from the joint mutual fund account in the amount of $23,000 to cash with a notation for "vacation" on the memo line (the "Vacation Check"). Laura deposited that check in a Statement Savings account held solely by her at Washington Mutual on or about June 6, 2005.

On June 2, Midwest wrote a check to Jeff in the amount of $23,000, and those funds were deposited into an account held by Jeff at Fifth Third Bank. On or about June 3, 2005, Laura wrote a check from the account at Fifth Third in the amount of $20,000 to cash with a notation for "tax refund" on the memo line (the "Tax Refund Check"). Laura deposited that check in her Washington Mutual account on the same day. Jeff did not disclose the $20,000 check in his Statement of Financial Affairs. Myler filed adversary proceeding number 06 A 1687 against Laura, seeking to recover the $20,000 on the theory that it was a fraudulent transfer. He eventually reached a compromise with Laura and settled the proceeding in exchange for 4 payments of $2,500.

Also on or about June 3, 2005, $2,500 and $9,000 were transferred in two separate transactions from Jeff and Laura's savings account at Fifth Third to their checking account. That same day, Laura wrote checks in the amount of $2,500 and $9,000 to cash from the checking account (collectively, the "College Checks"). A

notation on the memo line for the $9,000 check reads "college." Laura deposited those checks in her Washington Mutual Savings account on the same day for an opening deposit in that account of $11,500.

Neither the Vacation Check, the Tax Refund Check, nor the College Checks were disclosed in Jeff's Statement of Financial Affairs.

Checks Written from Laura's Washington Mutual Account on Jeff's Behalf

Laura wrote several checks from her Washington Mutual account after the $23,000 Vacation Check deposit cleared. Jeff testified that a number of these checks were written to his creditors. One of the checks was made out to John Kallman for $8,000. Kallman represented Midwest and Jeff in the federal court case brought by Green Bay. Laura was not named in the suit and she was not an employee of Midwest. Jeff testified that he asked Laura to write this check. Several checks were written by Jeff from the Washington Mutual account, although they were signed by Laura.

Jeff's Valuation of His Household Goods

Jeff scheduled his household goods and furnishings with a value of $1,000. Green Bay introduced into evidence a copy of Jeff's personal articles insurance policy for the period September 25, 2004 through September 25, 2005, where he insured jewelry, computer equipment and classical instruments for over $26,000. Jeff testified that he valued his property for the bankruptcy schedules based on what he could expect to receive at a garage sale. He also testified that he did not own the jewelry or the classical instruments.

<u>Jeff Did Not Schedule Fred as a Creditor</u>

Jeff did not schedule any liability to Fred that might still be due and owing under the agreement by which Fred transferred his membership rights in Midwest to Jeff. Jeff testified at trial that he did not schedule Fred as a creditor "because he's my father."

## LEGAL DISCUSSION

Pursuant to 11 U.S.C. § 727, Chapter 7 debtors are entitled to a discharge of all debts unless, <u>inter alia</u>, "(4) the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account." Section 727 is strictly construed against the objecting creditor and liberally in favor of the debtor, in order to protect the debtor's fresh start. <u>In re Sapru</u>, 127 B.R. 306, 314 (Bankr. E.D.N.Y. 1991). <u>See also</u> Fed. R. Bankr. P. 4005 ("At the trial on a complaint objecting to discharge, the plaintiff has the burden of proving the objection.").

For Jeff to be barred from discharge pursuant to § 727(a)(4)(A), Green Bay must prove by a preponderance of the evidence that he: (1) made a false statement under oath; (2) knew the statement was false; (3) made the statement with the intent to deceive; and (4) the statement related materially to the bankruptcy case. <u>In re Self</u>, 325 B.R. 224, 245 (Bankr. N.D. Ill. 2005); <u>In re Bailey</u>, 147 B.R. 157, 162(Bankr. N.D. Ill. 1992).

The only issue remanded to this court from the District Court is whether Jeff possessed an intent to deceive when he made certain false statements and omissions on his schedules and Statement of Financial Affairs. The intent to defraud must be actual and cannot be constructive. But because it is unlikely that a debtor will admit fraud, intent may be established by circumstantial evidence or by inferences based on an entire course of conduct. <u>Village of San Jose v. McWilliams</u>, 284 F. 3rd 785, 790 (7th Cir. 2002)

(discussing 727(a)(2)) (citations omitted). See Matter of Yonikus, 974 F. 2nd 901, 905-906 (7th Cir. 1992).

In Village of San Jose, the Circuit enumerated several factors a court should consider. If present, these factors indicate actual fraud:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

284 F. 3rd at 791.

The District Court found that "one or some of those factors are present here and, thus, the bankruptcy court should have shifted the burden to Jeff to demonstrate that he lacked fraudulent intent."

Jeff argued in his supplemental brief that no case law exists to support shifting the burden of proof under § 727(a)(4)(A), because Village of San Jose was decided under § 727(a)(2). He further argued that even if such case law did exist, Green Bay waived the right to raise it by failing to do so at the trial.

Whether or not Jeff makes a compelling argument, this court cannot consider it. Green Bay points out in its supplemental response that it made the burden-shifting argument on appeal to Judge Andersen in District Court, and that Jeff addressed it at that time. The District Court found against Jeff, and then remanded the case to this court with instructions to reconsider the evidence taken at trial in light of the shifted burden of proof on intent to deceive.

This court's position on Jeff's argument is irrelevant. After a direct appeal, the District Court instructed this court as to the rule of law it must follow. This instruction is binding precedent in this particular adversary proceeding. This court is bound by the District Court's remand to shift the burden of proof to Jeff on the issue of whether he lacked intent to deceive.

As a result, this court will review the circumstantial evidence of fraud identified by the District Court, keeping in mind that Jeff now bears the burden of proving that he lacked fraudulent intent. Certain items were specifically highlighted by the District Court at page 9:

> During the bankruptcy proceedings, Green Bay introduced evidence that, when Jeff filled out his bankruptcy petition and schedules, he (1) failed to disclose three transfers of funds that were made to Laura (the vacation check, the tax refund check, and the college checks); (2) failed to disclose the Edward Jones account which contained approximately $2,600 on the date of Jeff's bankruptcy filing; (3) scheduled his personal property with a value of $1,000 even though he insured such personal property for over $26,000 during the time period just before filing; (4) failed to disclose his alleged interest in Laura's Washington Mutual accounts; and (5) failed to schedule any liability to Fred that might still be due and owing under the agreement by which Fred transferred his membership rights in Midwest to Jeff.

The court will address these items in reverse order. The first question is whether Jeff's failure to schedule his liability to Fred might indicate an intent to deceive creditors. Even with the burden of proof on Jeff, the court finds that Jeff lacked intent to deceive when he omitted Fred from his schedules as a creditor. As Jeff pointed out, Fred is his father and was unlikely to try to collect this debt, a very reasonable reason for omitting him from his schedules. Moreover, scheduling Fred as a creditor would only have diluted the distribution available to other creditors. In fact, if Jeff had possessed the intent to defraud his creditors he would have scheduled Fred with as large a claim as possible.

The next to last piece of evidence is Jeff's failure to disclose an alleged interest in Laura's Washington Mutual accounts. As the court determined in its original opinion, Green Bay appears to have attributed Jeff's ownership interest to the fact that he wrote out several checks, which Laura signed. Additionally, one of the checks was made out to John Kallman, who represented Midwest and Jeff in the federal court case brought by Green Bay. Jeff testified that he asked Laura to write this check.

In its original opinion, the court found that Jeff did not have an interest in this account which he should have scheduled, and therefore his failure to list this account was not a false statement. Laura was the only signatory to the account, and the sole owner of the account. It was in her name. Jeff should not and properly did not include this account in his bankruptcy schedules.

As a result, the court did not even consider whether Jeff had fraudulent intent when he omitted any mention of this account from his petition and schedules. At this point, even if the court determined Jeff had an intent to deceive his creditors when he omitted these accounts from his petition and schedules, such a finding would not support denial of discharge. The court previously found that the omission was not a false statement, and that finding still stands.

The third piece of evidence also compels no change in the court's finding. Green Bay proved that Jeff scheduled his personal property with a value of $1,000 even though he insured that personal property for over $26,000 during the time period just before filing his bankruptcy case.

Jeff's valuation of his personal property does not raise a red flag. This court has reviewed thousands of Schedule B itemizations of personal property. The importance of

valuing property on Schedule B is to provide the case trustee with an idea of whether it would be worth his or her time to inventory the property and conduct a liquidation sale for the benefit of creditors. This court recalls very few cases – out of the thousands reviewed as a panel trustee, attorney or judge – in which a trustee determined that the personal property of an individual, that is, the contents of the debtor's home, was so valuable that a sale would be held. Moreover, at best Jeff only owns a one-half interest in the personal property he scheduled. Laura is not a debtor.

In this case, the court viewed a video taken of Jeff's personal property. The video shows the contents of Jeff's house, room by room. Having reviewed this video, the court found in its original opinion that Jeff's valuation of his personal property at $1,000 does not support a finding that he possessed an intent to defraud creditors.

This finding is not changed by the burden of proof shifting to Jeff. Jeff testified that he valued his property for the bankruptcy schedules based on what he could expect to receive at a garage sale. He also testified that he did not own the jewelry or the classical instruments on the insurance policy. Jeff may have insured the property at $26,000 to reflect its replacement value, but he has met his burden of proof on the issue of whether he lacked fraudulent intent when he valued his personal property at $1,000 on his Schedule B.

Finally, the court turns to Jeff's omissions of his Edward Jones account and of three checks - the Vacation Check, the Tax Refund Check, and the College Checks. In response to Question 3(c) of his Statement of Financial Affairs, Jeff was required to disclose "all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders." In the original

opinion, this court found that Laura was not a creditor, therefore Jeff did not need to disclose the Vacation Check, the Tax Refund Check, and the College Checks in response to this question. This finding still stands.

However, Question 10 of the Statement of Financial Affairs required Jeff to "list all other property other than property transferred in the ordinary course of the business or financial affairs of the debtor transferred either absolutely or as security within two years immediately preceding the commencement of the case." Jeff testified that these transfers were made in the ordinary course of his financial affairs because Laura "is the bill person" in his family.

As the court noted in its original opinion, the question presented "is not whether Jeff intended to defraud his creditors when Laura made three large cash withdrawals from their joint accounts and placed the money in her own name. The proper issue is whether Jeff's omission of these transfers from his Statement of Financial Affairs was done with the intent to deceive his creditors or with reckless disregard for the truth."

In that original opinion, with regard to this very issue, the court wrote that "Green Bay had the uphill battle of proving intent to defraud, and this it failed to do." Now the uphill battle has shifted to Jeff to prove that when he omitted these transactions from his Statement of Financial Affairs he lacked the intent to deceive his creditors, or that he acted with reckless disregard for the truth. As admitted in the original opinion, "[f]rankly, the court struggled with this issue. The transfers into Laura's account are questionable."

When the burden shifts to Jeff to show that he lacked an intent to deceive when he omitted these transactions, the court must find that Jeff failed to meet that burden. In a

two day period, Laura and Jeff withdrew nearly $55,000 from their joint account, allegedly for a vacation and for college costs, and a portion of which was supposedly attributable to a tax refund. All of these funds were transferred to accounts controlled solely by Laura, who did not file for relief under the Bankruptcy Code.

Aside from his testimony that these were ordinary transfers because Laura was the "bill person," Jeff introduced no evidence to show why he would believe that these transfers were in the ordinary course of his family's financial affairs. First, $23,000 is an enormous amount of money for a vacation, especially when a person's business is failing. There is no evidence to suggest that the Vacation Check represented an ordinary expense rather than a once-in-a-lifetime splurge. Nor was any evidence introduced to support Jeff's contention that the $20,000 transfer related to a tax refund, or that the $11,500 transaction (actually two separate checks) represented college costs. These checks were all written during the first week of June. In that same month, Green Bay cut off Midwest's credit, when its outstanding balance grew to $644,000.

Without evidence that these were ordinary transfers in the Oscarson family, the court is left with the following situation: Large amounts of money were transferred from Jeff's joint account with his wife to her sole account, at the same time as his business was failing, and shortly before he filed - without Laura - for relief under the Bankruptcy Code. When required under oath to disclose property transferred outside of the ordinary course of business in the year prior to filing, Jeff omitted these transfers.

The District Court instructed us that the burden falls on Jeff to prove that he did not intend to deceive his creditors when he did not list these transfers in response to Question 10. In light of this instruction and after considering Jeff's entire course of

conduct, the court must conclude that Jeff did not prove that he lacked the intent to deceive his creditors when he failed to disclose these transfers on his Statement of Financial Affairs. At the very least, he failed to prove that he did not act with reckless disregard for the truth. Certainly, it is difficult to prove a negative. But the District Court shifted the burden to Jeff, and he did not meet it.

With regard to the Edward Jones account, the last piece of evidence highlighted by the District Court, this court originally held that Jeff's discharge should not be denied where he failed "to itemize one account out of several, and this account contained less than $3,000. This omission does not rise to the level of deceit required to deny a debtor's discharge. While there 'comes a point when the aggregate errors and omissions cross the line,' In re Bostrom, 286 B.R. 352, 360 (Bankr. N.D. Ill. 2002), that point has not been reached here."

The court has now found, however, that Jeff failed to prove that he lacked the intent to deceive his creditors when he omitted the Vacation Check, the Tax Refund Check and the College Checks from his Statement of Financial Affairs. As a result, his omission of the Edward Jones account does not stand alone, and Jeff's aggregate omissions have crossed the line identified in Bostrom. Jeff's discharge will be denied.

## CONCLUSION

After reviewing the evidence presented at trial, and under the rule of law set forth on remand by the District Court, for all of the reasons stated above this court finds that Jeff Oscarson did not meet his burden of proving that he lacked the intent to deceive creditors when he omitted certain information from his Statement of Financial Affairs. As a result, the original judgment of this court is reversed as to Green Bay's request to deny Jeff's discharge under 11 U.S.C. § 727(a)(4)(A). Judgment is entered for the plaintiff on this count.

Date: JUL 2 2008

PAMELA S. HOLLIS
United States Bankruptcy Judge